UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Judith A., | ) | |
| | ) | |
|    *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50316 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|    *Defendant*. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff is seeking disability benefits based on post-traumatic stress disorder, depression, anxiety, and bipolar disorder. Now 52 years old, she worked steadily for about 20 years, but eventually stopped because of her psychological problems. In September 2016, she filed her Social Security disability applications. Two months earlier, she had started treatment with Dr. Mardjan Foroutan, a psychiatrist. In May 2018, just a few months before the administrative hearing, Dr. Foroutan completed an RFC questionnaire that, if fully credited, would compel a finding that Plaintiff was disabled. But the administrative law judge ("ALJ") gave this opinion little weight and also found Plaintiff's testimony not credible and therefore denied her benefits.

Plaintiff raises three main arguments for remand. Her first and most developed argument is that the ALJ provided an insufficient explanation for rejecting Dr. Foroutan's opinion. This Court agrees. The Court will begin with, and mostly focus, on this argument.

The ALJ first summarized Dr Foroutan's opinion and then gave four reasons for giving it only "slight weight." R. 27. As a preliminary point, the ALJ's summary of Dr. Foroutan's opinion is somewhat slanted, arguably creating a strawman opinion. The ALJ's summary suggests that Dr. Foroutan opined that Plaintiff's limitations were *all* "extreme" or "marked."

1

Although Dr. Foroutan certainly did assess some of Plaintiff's abilities as falling into these two categories, Dr. Foroutan also found that other abilities were only mildly limited. For example, Dr. Foroutan opined that Plaintiff was only "mildly limited" (the lowest possible category) in the ability to "understand and remember very short and simple instructions." R. 555. But the ALJ's summary states that Dr. Foroutan opined that Plaintiff had "marked limitations *with even very short and simple instructions.*" R. 27 (emphasis added). This seems to be a misstatement. To be fair to the ALJ, Dr. Foroutan did indicate that Plaintiff was "markedly limited" in her ability to *carry out* very short and simple instructions, as opposed to being able to *understand and remember* those instructions. In any event, the larger point is that Dr. Foroutan made distinctions among Plaintiff's abilities in different areas. Dr. Foroutan did not take a knee-jerk approach by checking the most extreme category across the board, as the ALJ implied.

The Court will now consider the four rationales. The first rationale—that Dr. Foroutan's opinion was inconsistent with the objective evidence—is the strongest one. Before discussing it, the Court will consider the second, third, and fourth rationales, which are much weaker.

**Rationale #2—The Sympathetic Doctor and the Pushy Patient.** The ALJ described this rationale as follows:

> The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

R. 27. The ALJ did not provide any concrete evidentiary basis for concluding that Dr. Foroutan was exaggerating or making false statements when completing the RFC questionnaire or that Plaintiff exerted undue influence. Instead, the ALJ was apparently relying on the general notion

2

that all treating physicians tend to exaggerate, perhaps unconsciously, to help their patients get government benefits. This Court is not persuaded that this vague rationale is a sufficient reason, even in a minor supporting role, to discount a medical opinion. The Court agrees with the analysis in *Sihocky v. Berryhill*, 17-CV 50001, 2018 WL 1726427 (N.D. Ill. Apr. 10, 2018), where a similar argument was rejected:

> These facts suggest that Dr. Mardjetko, rather than being either a trigger-happy surgeon or a passive agent of plaintiff's desires, as the ALJ suggested, was proceeding in measured steps. Despite the absence of concrete evidence supporting the theory, it is still possible that Dr. Mardjetko was motivated by financial considerations, but this general suspicion could be directed at almost any doctor. For this reason, several district courts have rejected this type of reasoning. *See Baizer v. Berryhill,* 2017 WL 1208440, *6 (N.D. Ill. Apr. 3, 2017) ("[T]he ALJ offers no support for his contention that the opinion of Dr. Kim may have been biased because it was given during Plaintiff's worker's compensation claim. Indeed, an ALJ's mere conjecture of a sympathetic response is not an acceptable basis for ignoring a treating physician's opinion."); *Beason v. Astrue*, 2009 WL 1064911, *5 (C. D. Ill. Apr. 17, 2009) ("[A]ny doctor will gain financially if a patient pays his bills. To reject a physician's opinions on the basis that he or she may gain financially if the claimant succeeds in obtaining social security benefits and therefore might be better able to pay their medical bills would effectively eliminate a claimant's ability to establish his case. In the absence of other evidence that Dr. Maurer had an ulterior motive for her opinions, the Court concludes that this suggestion does not constitute a basis for rejecting Dr. Maurer's opinions.").

*Id.* at *2-3. The Court agrees with this reasoning and finds that no weight should be given to this rationale.[1]

**Rationale #3—Cocaine.** The ALJ described this rationale as follows: "It is also notable that the claimant indicated she never informed her doctor of her active cocaine use, a fact of which she admitted at the hearing it would be important for her doctor to be aware (Hearing Testimony)." R. 27. The factual foundation and medical assumptions underlying this rationale are not adequately developed.

---

[1] The ALJ's final sentence attempts to bolster this second rationale by tying it back to the first rationale (lack of objective evidence), but this is basically an attempt to double-count the first rationale.

As for the facts, the ALJ aggressively construed Plaintiff's hearing testimony. The ALJ referred to Plaintiff's "active cocaine use" and claimed she agreed it was an "important" fact she should have disclosed to Dr. Foroutan. But the hearing testimony upon which the ALJ relied is less clear. Here is the relevant exchange:[2]

> Q [by the ALJ] So, ma'am, have you used cocaine?
>
> A On occasion.
>
> Q Okay, and when was the last—
>
> A Not on a daily basis.
>
> Q —time you used it?
>
> A Probably six months ago/seven months ago.
>
> Q And you did not tell your psychiatrist that you used cocaine?
>
> A No.
>
> Q Do you think that's something—
>
> A Because it was only a one-night thing.
>
> Q —that the psychiatrist should know?
>
> A Yeah.

R. 55-56. As this exchange indicates, Plaintiff initially answered that she did *not* think it was an important fact to disclose because it was only a "one-night thing," but she then relented after the ALJ pressed her with a leading question. Even if Plaintiff did think it was important, she was not the expert rendering the opinion. The ALJ assumed this fact would have been material in assessing Plaintiff's particular constellation of impairments and that Dr. Foroutan not only would

---

[2] Earlier in her testimony, Plaintiff denied using cocaine at all.

have changed the opinion but would have done so by finding Plaintiff's problems less rather than more severe. Given all these inferential leaps, this rationale is also too speculative.

**Rationale #4—Plaintiff's Attorney and Dr. Foroutan Allegedly Disagree.** The fourth rationale was the following: "In addition, the claimant's own representative at the hearing argued for marked limitations, rather than the extreme limitations opined [by Dr. Foroutan]." R. 27. The ALJ seemed to believe that the different ratings, marked versus extreme, given by Plaintiff's attorney and her psychiatrist were a valid reason to doubt the psychiatrist's opinion. This rationale is weak for several reasons.

First, the difference between the two ratings is small. On the five-point rating scale, "marked" and "extreme" are the fourth and fifth categories respectively—both next to each other on the disabled end of the spectrum. It is hard to see why this slight difference would be a ground for suspicion. Second, and more concerning, the ALJ left out a critical qualifying phrase used by Plaintiff's attorney when making the statement the ALJ relied on. Here is the attorney's statement: "I would argue that there is *at least*, *at the bare minimum*, moderate—or marked limitations excuse me, in interacting with others and concentrating, persisting or maintaining pace." R. 48 (emphasis added). The ALJ ignored the italicized language. Once it is properly considered, the supposed contradiction evaporates under any fair interpretation.

To sum up, the second, third, and fourth rationales are questionable and too speculative. The fact that the ALJ chose to rely on them at all raises doubts about the overall analysis.

**Rationale #1—Inconsistency with the Objective Evidence.** We turn finally to the first rationale. It is more substantive and does have an evidentiary foothold in the record. The ALJ believed that the objective evidence—primarily, the normal mental status examinations—were inconsistent with Dr. Foroutan's more extreme opinion. This is certainly a legitimate area to

explore. *See Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020) (ALJ could reject treating physician opinion because, among other reasons, it "conflicted with the objective medical evidence"). Even though this rationale is more promising, it is still insufficient because, in addition to being the only one left standing, it relies too much on doctor playing and cherrypicking.

As for doctor playing, the ALJ did not call a medical expert at the hearing. The ALJ did rely on two State agency opinions ostensibly supporting the RFC findings. But the problem is that neither doctor was aware of Plaintiff's two multi-day hospitalizations in 2017, one in May and one in October which included a suicide attempt, both stays being caused by a deterioration in her mental condition. This evidence is undeniably significant. Therefore, the Agency opinions could not provide support for the ALJ's decision. *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) ("ALJs may not rely on outdated opinions of agency consultants 'if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.'"). Given the lack of a supporting medical opinion, the ALJ's decision necessarily rested on a layperson analysis. This problem is evident in several areas.

First, the ALJ made implicit medical judgments about the weight of particular findings and how they should be weighed. For example, the ALJ stated: "While [Plaintiff] was noted to *have poor hygiene and making intense eye contact and psychomotor agitation*, Dr. Foroutan also noted she exhibited a euthymic mood, normal range and intensity of affect, normal speech, no signs of a thought disorder, logical thought processes with no impairment of abstract thinking, no delusions, obsessions, or compulsions, and good judgment and insight." R. 25 (emphasis added). The ALJ's statement suggests that the findings in the second half of the sentence negated those in the first half. By declaring some symptoms more significant than others, the ALJ was playing doctor. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJs must "rely on expert

opinions instead of determining the significance of particular medical findings themselves"). Perhaps the ALJ's instincts about how to reconcile the medical findings will ultimately be proven right, but a medical expert should confirm these intuitions.

Second, as the Seventh Circuit has noted, claimants with mental impairments like bipolar disorder often have "good days and bad days." *See Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) ("a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition"); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (same). Plaintiff has alleged that her symptoms were also episodic, a point the ALJ did not acknowledge. A person with waxing and waning symptoms will necessarily have some normal examination findings. The ALJ placed much weight on the fact that Dr. Foroutan made many normal findings on the same day the opinion was completed. But this overlooks the fact that Dr. Foroutan had an almost two-year treatment relationship and was presumably basing the opinion on the totality of observations over this time.

Third, the ALJ concluded that Dr. Foroutan's opinion was out of touch not only with the doctor's own treatment notes, but also with the "longitudinal treatment history." But this claim has not been substantiated. This is not a case where there are numerous doctors offering competing or contrary assessments. Plaintiff was evaluated by a consulting psychologist, Dr. David NieKamp. Ex. 3F. His report was a potential source of independent evidence to assess Dr. Foroutan's opinion. The ALJ summarized this report, noting that Dr. NieKamp made many normal findings during his one-time examination. The ALJ thus read this report as being in opposition to Dr. Foroutan's opinion. However, the ALJ downplayed the fact that Dr. NieKamp, despite making these normal findings, nonetheless diagnosed Plaintiff with "moderate *to severe*" depression and anxiety with PTSD features. R. 385 (emphasis added). These diagnoses are

7

roughly consistent with Dr. Foroutan's conclusions. Put differently, it is far from clear that they are contradictory. The ALJ's only attempt to acknowledge this fact was this conclusory statement: "While Dr. NieKamp noted that [Plaintiff's] reported symptoms and history were commensurate with moderate to severe levels of depression and anxiety, the objective mental status examination findings were inconsistent with her reports." R. 24. The Court cannot follow this reasoning. The ALJ seems to be just declaring that Dr. NieKamp was wrong. More analysis is needed.

Fourth, the ALJ's discussion of Plaintiff's two hospitalizations in 2017 was incomplete. The ALJ dismissed this evidence as unimportant because the ALJ concluded that the hospitalizations were caused by Plaintiff's medication non-compliance, because Plaintiff's condition improved after staying in the hospital, and because her doctors made normal examination findings in subsequent visits. Aside from the ever present concern of doctor playing, the ALJ's explanations failed to consider several important factors. One of them is that claimants with mental impairments may have difficulty staying compliant. *See Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease) may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment") (internal citations omitted); *Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015) (same). Another factor is that patients often improve in structured settings. *See Harlin v. Astrue*, 424 Fed. App'x. 564, 568 (7th Cir. 2011) ("the evidence that the ALJ chose [] to rely on—discharge summaries showing Harlin's improved condition at the time of discharge—was hardly remarkable because one would expect a patient with severe mental impairments to improve upon a course of treatment in a structured hospital environment"). As

8

for the claim that Plaintiff allegedly had numerous normal examinations after those hospitalizations, a fact the Commissioner emphasizes, the Court notes that Plaintiff also had normal examinations *before* the hospitalizations, raising a question of how reliable normal findings were about Plaintiff's future behavior and stability.

Fifth and finally, the ALJ engaged in some cherrypicking to construct a fairly rosy picture of Plaintiff's condition. But the source materials the ALJ relied on often suggested a more complicated and bleaker outlook. Two examples from December 2016 illustrate this concern. The ALJ gave the following summary of Plaintiff's visit with therapist Victoria Mourning on December 12, 2016: "The claimant also reported increased stress around the holidays, reporting stressors related to the loss of her husband and financial constraints, yet she also reported activities such as cooking meals for her son (Exhibit 2F/58)." R. 24. Putting aside whether the ability to cook a meal for your son is a good barometer of your overall mental condition, the ALJ's summary leaves out important contextual details. Here is the source the ALJ relied on:

> Client presented in a open and communicative mood. Client was tearful throughout session "I am just sad. The holidays are just hard." When processing stressors related towards the events client shared "I have been having really bad racing thoughts." Client shared she has been isolating herself and avoiding speaking about her feelings and thoughts "I just have no ambition. I am trying to hide my feelings." When problem solving gifts for son client identified her ability to cook him meals "guess I will go home and see what I can cook for him [son]." Client was provided with inspirational coloring pages to utilize as a coping skills.

R. 376. A similar distortion occurs in the ALJ's summary of Plaintiff's visit with Ms. Mourning on December 23, 2016. The ALJ stated: "[Plaintiff] also reported feeling a bit better when she was able to sell a few things to obtain money for Christmas gifts for her son, again suggesting the situational factors were an issue (Exhibit 2F/60)." R. 24. Again, the source material contains contrary evidence the ALJ omitted or downplayed:

9

> Client reports feeling a "little bit better." Client reports finding a way to sell a few things to obtain money to purchase Christmas gifts for her son. Client reports her depressive and anxiety symptoms are "still there" and that she has been "hiding" her symptoms away from her son due to not wanting him to see her feeling that way. Client reports she has been maintain open communication with her fiance as well as her son.

R. 378.

In sum, the ALJ's analysis of Dr. Foroutan's opinion is not sufficient. Plaintiff has raised a few other arguments tied to the ALJ's failure to explicitly go through the checklist factors under the treating physician rule, but this Court concludes that no further analysis is needed because the ALJ's four rationales are not sufficient under the more lenient analysis that merely asks whether the ALJ had "good reasons" for rejecting the medical opinion. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

Having concluded that a remand is required based on the Plaintiff's first argument, the Court will only briefly comment on the remaining arguments, most of which relate to the credibility finding.

In this Court's view, on remand, more attention should be given to the general issue of Plaintiff's alleged cocaine use. This issue was mentioned several times in the decision, suggesting the ALJ thought it was important, but the issue was not discussed in a clear or complete manner. It is not clear, for example, whether Plaintiff was a one-off sporadic user, as she claimed, or whether she was she an "active user," as the ALJ stated at one point. In his brief, the Commissioner puts even more weight on the cocaine use and specifically on Plaintiff's failure to tell Dr. Foroutan about it. One concern is whether either the ALJ or the Commissioner were unfairly making the type of broad-brush overall character judgment that SSR 16-3p advises against. This issue should be analyzed more openly and thoroughly, especially since it has the potential to operate in a prejudicial subterranean manner.

Another topic deserving more attention is Plaintiff's driving. The ALJ mentioned several times that Plaintiff was able to drive, suggesting that this fact was given more than minimal weight. But the record is unclear about how extensive Plaintiff's abilities were. At the hearing, the ALJ twice asked Plaintiff about this issue, but each time the questioning ended in a monosyllabic dead-end. *See* R. 61 ("Q [by the ALJ] Do you drive? A Yes."); R. 65 ("Q [by the ALJ] Did I ask you if you drove? A Yes, you did." R. 65. The ALJ asked no follow-up questions about how often or how far Plaintiff drove or whether she had any problems or accidents while driving. Based on the following description, the ALJ clearly believed that driving is a very complex and cognitively demanding activity:

> The claimant also admitted she could drive a car (Id.). While the claimant contends that her functional abilities are severely limited, it is difficult to reconcile the fact that the claimant, throughout the period of alleged total disability, reported she continued to operate a motor vehicle. The operation of a vehicle is a very dynamic task in a changing environment that is largely influenced by the driver. Since the primary role of any motor vehicle operator is the safe control of the vehicle within the traffic environment, driving can be considered a complex task that requires the making of continuous decisions/judgment calls. It also requires social interaction, and the ability to multitask while dealing with external and internal stimuli. Driving as an activity is therefore made up of strategic decisions (i.e. route-choice while driving, mirror use, vehicle speed, vehicle condition, response to emergency vehicles, etc.), maneuvering decisions (i.e. reaction to: the behavior of other traffic participants, road hazards, pedestrians, animals, etc.), and control decisions (i.e. basic vehicle operation, radio and/or cellphone operation, etc.), all of which indicate functioning at a level in excess of that alleged by the claimant. Nevertheless, when demand exceeds a driver's capacity, it may result in affected performance; however, in the instant matter, it is clear from the record that, at least at times relevant to the issue of disability, the claimant retained the cognitive ability to drive, and the fact she was capable of such a complex task was considered when assessing the severity of her allegations regarding the aforementioned mental disorders.

R. 19-20. The ALJ did not state whether this long description was based on an outside source, such as an expert report. Maybe the ALJ was merely reflecting on her own driving experience. Although this Court is not an expert, this passage seems to vividly play up the cognitive

11

difficulties of driving.[3] But even accepting the ALJ's characterization, the ALJ did not acknowledge that neither Dr. Foroutan nor Plaintiff claimed that Plaintiff's main problem was her cognitive limitations, at least not over short time periods. They have claimed that she has problems sustaining concentration of longer periods, such as an eight-hour work day. So it would not necessarily be inconsistent with their views if Plaintiff were able to drive, especially for short trips. This point connects back to another argument we have not addressed, which is Plaintiff's complaint that the ALJ did not fully consider whether Plaintiff's moderate limitations in concentration and persistence were adequately addressed by the RFC limitations. This Court agrees that this issue needs more analysis on remand as well.

One final point is the ALJ's statement that Plaintiff's "continued job search again suggests the possibility that if she had found work, perhaps the claimant would not currently be claiming disability, and that the reason for the claimant's continued unemployment is not solely the alleged impairments." R. 25. This rationale is questionable. The ALJ speculates about what inferences could be drawn "if" Plaintiff found work, but the fact is she didn't. As the Seventh Circuit has stated, looking for work "might simply indicate a strong work ethic or overly-optimistic outlook rather than an exaggerated condition." *Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016).

The above reasons are sufficient to order a remand. To the extent that there are any remaining arguments in the briefs that the Court has not addressed, Plaintiff should explicitly raise them with the ALJ on remand to ensure they are not overlooked. Any failure to do so may constitute a waiver if there is a subsequent appeal to this Court.

---

[3] *Cf.* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5619413/, "Cognitive impairment and driving: A Review of the Literature" ("There is now sufficient evidence to suggest that not all persons with dementia are hazardous drivers, and that some of these individuals may continue to drive if they are regularly reevaluated.").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and this case is reversed and remanded for further consideration.

Date:  February 16, 2021          By: _____
                                Lisa A. Jensen
                                United States Magistrate Judge